## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ANGELO M. GORDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3259 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Angelo Gordon (Gordon) appeals from the denial of his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Gordon filed a Motion for Summary Judgment (d/e 10).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 14).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be reversed and remanded.

<u>STATEMENT OF FACTS</u>

Gordon was born on May 25, 1986.  Certified Transcript of Proceedings before the Social Security Administration (d/e 6) (R.) 43.  The Springfield, Illinois, Public School District No. 186 (District) placed Gordon in special education classes.  The District determined at various times that Gordon had an emotional disorder, a learning disability, and a speech/language deficit.  R. 485.

Throughout his education, District officials periodically tested Gordon's intelligence quotient (IQ).  On October 24, 1995, while Gordon was in the second grade, his verbal IQ test score was 63, his performance IQ score was 57, and his full-scale IQ score was 56.  R. 485.  On June 8, 1999, when Gordon was in the sixth grade, his verbal IQ test score was 82, his performance IQ score was 71, and his full-scale IQ score was 75.  R. 486.  On November 14, 2002, when Gordon was in the 10th grade, his verbal IQ test score was 89, his performance IQ score was 66, and his full-scale IQ score was 77.   R. 485.  Gordon quit school in the 10th grade.  He was 16 years old at the time. R. 44.

On May 15, 2006, Gordon saw state agency psychologist Dr. Michael Trieger, Psy.D., for a psychological evaluation.  R. 508-11.  Dr. Trieger administered an IQ test.  Gordon had a verbal IQ score of 88, which was

"low average" in the 21st percentile; a performance IQ score of 74, which was borderline in the fourth percentile; and a full IQ score of 79, which was also borderline in the eighth percentile.  R. 510.

Dr. Trieger assessed depressive disorder, not otherwise specified, and a "residual learning disability (visual-perceptual)."  Dr. Trieger assigned a Global Assessment of Functioning (GAF) score of 55.  A GAF score is an assessment of the overall level of functioning of an individual.  A GAF score of 51 to 60 indicates either moderate symptoms or moderate difficulty in social, occupational, or school functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV-TR), at 34.  The American Psychiatric Association no longer recommends the use of GAF scores.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

On January 26, 2010, Gordon filed an application for SSI.  R. 116.

On November 21, 2011, state agency psychologist Dr. Stephen G. Vincent, Ph.D., conducted a psychological evaluation of Gordon.  Dr. Vincent also conducted an IQ test.  The scoring categories on IQ tests changed between 2006 and 2011.  Gordon's full scale IQ was 68, his working memory index score was 76, and his perceptual reasoning score

was 76.  Dr. Vincent diagnosed Gordon with mood disorder, secondary to

general medical conditions, with major depressive-like features, and

borderline to mild mental retardation with associated functional illiteracy.  R.

538-39.

Dr. Vincent also completed a Medical Source Statement of Ability to

do Work-Related Activities (Mental).  R. 540-42.  Dr. Vincent opined that

Gordon had moderate limitations on his ability to understand, remember,

and carry out simple instructions; and to make judgments on complex work-

related decisions.  Dr. Vincent opined that Gordon had marked limitations

in his ability to make simple work-related decisions; and to understand,

remember, and carry out complex instructions.  R. 540.  Dr. Vincent

explained,

> Borderline intellectual functioning with deficits in literacy and
> conceptual, practical, and social intelligence would markedly
> impair his ability to carry out detailed tasks and moderately
> impair work-related decisions.

R. 540.  Dr. Vincent opined that Gordon was moderately limited in his

ability to interact appropriately with the public, supervisors, and coworkers;

and to respond appropriately to usual work situations and changes in

routine work settings.  R. 541.  Dr. Vincent explained, "Depression with

pain would moderately impair his capacity to interact with others and adapt

to changes in the work place.  R. 541.

Dr. Vincent further noted that Gordon denied any current problems with alcohol and substance abuse, but evidence in his medical records showed "such tendencies." Dr. Vincent opined that those tendencies would "have an impact an[d] (sic) relevance if he relapses." R. 541.

On December 29, 2011, an Administrative Law Judge (ALJ) conducted an evidentiary hearing on Gordon's 2010 application for SSI. R. 88-112. On January 3, 2012, the ALJ determined Gordon was not disabled and denied the application. R. 116-25.

On March 26, 2012, Gordon saw Dr. Vincent again for a second psychological evaluation. Dr. Vincent diagnosed major depression, generalized anxiety disorder with panic-like episodes, intermittent explosive disorder, impulse control disorder, with symptoms appreciably paralleling attention deficit/hyperactivity disorder, common type. R. 546. Dr. Vincent did not conduct an IQ test at this time.

On January 16, 2014, Gordon filed the current application for SSI. R. 20. On March 25, 2014, Dr. Trieger conducted a psychological evaluation of Gordon. R. 569-72. Dr. Trieger concluded:

> Summary: Angelo Gordon is a 27-year-old male referred by the Illinois Department of Human Services for evaluation of his mental status. Angelo presents with a reported history of learning disabilities. He added that he gets anxious and depressed. His clinical presentation was noteworthy for mild anxiousness and some degree of cognitive limitation, but was

otherwise unremarkable.  Angelo reports some insomnia and paranoid thoughts.  He takes no psychotropic medication at this time and is not engaged in outpatient counseling.

If Angelo were deemed eligible for continuing disability benefits, he would not need a third party payee.

R. 571.  Dr. Trieger diagnosed schizoaffective disorder, mild; and learning disabilities by Gordon's report.  R. 571.  Dr. Trieger did not perform an IQ test at this time.

On April 15, 2014, state agency psychologist Dr. Carol Mohney, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  R. 165-66, 167-69.  Dr. Mohney opined that Gordon suffered from organic mental disorders and schizophrenic, paranoid, and other psychotic disorders.  She opined that Gordon had mild restrictions on activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Mohney found that Gordon had no episodes of decompensation.  R. 165.  Dr. Mohney opined that Gordon was moderately limited in his ability to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact appropriately with the general public; and to accept instructions and respond appropriately to

criticism from supervisors.  R. 168. Dr. Mohney opined, "Claimant retains the ability to perform simple tasks on a sustained basis with only superficial interaction with the public."  R. 169.  Dr. Mohney also opined that Gordon had the "ability to perform simple tasks on a sustained basis with only incidental interaction with the public."  R. 166.

On February 15, 2015, state agency psychologist Dr. Michael J. Schneider, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  R. 183-84, 185-88.  Dr. Schneider opined that Gordon suffered from organic mental disorders and schizophrenic, paranoid, and other psychotic disorders.  He opined that Gordon had mild restrictions on activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Schneider found that Gordon had no episodes of decompensation.  R. 183-84.  Dr. Schneider opined that Gordon was moderately limited in his ability to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; and to accept

instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  R. 186-87. Dr. Schneider opined, "Claimant retains the mental capacity to perform unskilled, repetitive work in a low pressure work environment where there are minimal demands for interacting with others."  R. 187.  Dr. Schneider also opined that Gordon had the "ability to perform simple tasks on a sustained basis with only incidental interaction with the public."  R. 184.

On May 12, 2015, Gordon saw psychiatrist Dr. Chauncey Maher, M.D., for an initial psychiatric examination.  R. 651-52.  Dr. Maher assessed impulse control disorder, alcohol dependence, cannabis dependence; and borderline IQ, Cluster B features.  Dr. Maher assigned a GAF score of 40.  R. 651.  A GAF score of 31 to 40 indicates some impairment in reality testing or communication; or major impairment in several areas such as work, school, family relations, judgment, thinking, or mood.  DSM-IV-TR, at 34.  Dr. Maher prescribed medication and asked Gordon to cease alcohol and cannabis use.  R. 651.

Two days later, on May 14, 2015, Gordon saw Dr. Maher for medication monitoring.  Gordon's condition remained largely unchanged. Dr. Maher assigned a GAF score of 41. A GAF score between 41 and 50

indicates serious symptoms or serious impairment in social, occupational, or school functioning.  DSM-IV-TR, at 34.

On June 28, 2016, an Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 38-87.  Gordon appeared with his attorney. Vocational expert Dr. James Lanier, Ph.D., also appeared.  R. 40.

Gordon testified first.  Gordon lived in a one-story house in Springfield, Illinois.  He left school at the age of 16.  He has not passed the GED exam.  Gordon explained,

> What happened that I had to drop out of school because I got --
> I got sick when I was 16 and my leg - - my leg got purple then
> when I was 16 and I was missing some days out of school so
> they put me out of school, but I have tried taking the GED test.

R. 44.  Gordon also said that school officials wanted him to repeat the ninth grade.  Gordon said he had problems with math.  R. 45.  He stated that he could not write because he was "not good at punctuation marks."  He could read a little bit, but could not write.  R. 46.

Gordon said he worked briefly as a home health care worker and for a cleaning service.  He lost the first job because he had an argument with a patient, and lost the second job because he fought with his supervisor.  R. 48-49.

The ALJ asked Gordon about taking amitriptyline.  Gordon said he

had "a psychotic attack" and went to the hospital.  The doctors gave him

amitriptyline to help him sleep. Gordon testified:

> Yes, I had a psychotic attack and I had to go to the hospital and
> they gave me that to help me sleep better because like certain
> sounds set me off and people kept waking me up and I felt like
> that I was going to kill them so I had to -- I had to check myself
> in the hospital and they gave me that for my psychotic attack.

R. 56.  Gordon described how he felt when he heard sounds of people

outside at night knocking at his door:

> [D]isturbing my peace and I felt like the only way to make them
> leave me alone is to get violent with them because I asked
> people nicely to leave me alone.  I was living in my apartment
> building and all I did was wanted my privacy, but  people kept
> knocking at my door and all type of crazy stuff and running
> through the hallways: and all type of stuff that I couldn't rest in
> peace.  It was making me feel like Dr. Jekyll and Mr. Hyde
> basically.

R. 56-57.  Gordon also had problems sleeping because of noises from a

nearby baseball field and a railroad track.  He said that fireworks

sometimes went off and disturbed him.  R. 57.

Gordon also said he was disturbed by a "bomb" that the police

exploded near his head:

> Q   You mentioned that you were disturbed by a police
> explosion in the past?
>
> A       Yes, sir. They put a bomb -- one of those bombs that
> make—I guess it's supposed to be a sound bomb, but they put

> it by my head and I seen it blow up and it was a fire and then
> they kicked me in my side and it messed me up.

R. 57.  Gordon indicated that the police entered his home and arrested him

for violation of marijuana laws.  Apparently, the officers set off a flash

grenade when they entered his home.  Gordon said he was convicted of

manufacturing and delivery of marijuana.  He reported that he received a

sentence of probation for three and a half years.  R. 57-58.

Gordon said he had been arrested on other occasions.  He was

arrested for fighting with his brother once, and was arrested when he

argued with a police officer.  Gordon said he paid a fine after the incident

with the officer.  He also argued with the judge who sentenced him to pay

the fine.  Gordon said: "But, that's the last time I got in trouble."  R. 62.

Gordon said his mother paid his fine because he and his mother believed

that "they" were going to kill Gordon if the fine was not paid.  R. 62.

Gordon said he told Dr. Maher about the second incident, and Dr. Maher

told him about his anger issues. R. 59-61.  Gordon broke up with his

girlfriend because they argued "a lot."  R. 74.

Gordon testified that he sometimes got sick when he went out in

public.  He said, "Yes, sometimes I have to go to the bathroom a lot when

I'm out in public and it's kind of hard for me to go to the bathroom because

business to handle and I have to go."  R. 70.  Gordon said he used the
restroom twice since he arrived for the hearing.  R. 70.

Gordon stated that he had problems trusting people.  He said, "I
mean I get paranoid with people sometimes and sometimes I just – I don't
know how to explain it.  I just don't trust people."  R. 73.  Gordon explained,
"When I feel like people are talking trash or somebody yelling at me or, you
know, just people like – a lot of people talk trash or people yelling at me."
R. 74.

Gordon said he used marijuana to relax his nerves and because of a
stomach problem.  R. 58.  Gordon stated that he smoked marijuana about
once a month.  R. 73.  He said he drank alcohol when he could not get
marijuana.  He testified he got a relaxing feeling from drinking.  He said, "I
don't really drink every day."  R.58-59.  At one sitting, he drinks a beer or a
glass of wine.  R. 72-73.

Gordon said he saw a psychiatrist named Dr. Bland.  He used to see
Dr. Maher, but he retired.  He also saw a counselor once every three
weeks.  R. 58-59.  Gordon missed some counseling appointments because
of scheduling conflicts.  Gordon said, "[T]hat's what gets me paranoid like
people will schedule appointments on the same day and I'm like how do
you know what day – like these people would schedule on the same day

and it would  -- it would drive me crazy."  R. 75.  Gordon testified that his

current doctor still prescribed amitriptyline to help him sleep.  Gordon's

doctor told him to take it "every now and then and not every day."  R. 72.

Vocational expert Dr. Lanier then testified.  The ALJ asked Dr. Lanier

the following hypothetical question:

> [I]'d like you to assume that this individual will have difficulty
> understanding complex, handling highly-detailed instructions;
> this individual has deficits in concentration, persistence, and
> pace.
>        Considering these factors, I'd like you to assume this
> individual was limited to performing non-complex, routine, and
> repetitive tasks on a sustained basis with only routine breaks;
> this individual will do best in a socially-restricted environment.
> Considering this, I'd like you to assume that any work should
> not require more than ordinary -- I'm sorry, should not require
> more than occasional contact and no interaction with the
> general public and also any work should not require more than
> superficial interaction with coworkers. I'd like you to assume
> that any work should involve any more than ordinary or routine
> changes in work setting or duty.

R. 78.  Dr. Lanier opined that such a person could perform the jobs of hand

packager, with 5,400 such jobs in Illinois and 102,900 nationally; janitor,

with 2,200 in Illinois and 65,600 nationally; and hospital cleaner with 3,000

such jobs in Illinois, and 76,900 nationally.  R. 78-79.

Dr. Lanier stated that the person had to be able to read to work.  R.

79.  He opined that such a person could not work if he was off-task 20

percent of the time at work.  Dr. Lanier opined that a person needed to be

on-task 90 to 95 percent of the time.  He opined that a person would be

terminated if he were off-task more than 10 percent of the time at work. R.

81.  Dr.Lanier also opined that a person would not be employable if he was

absent from work more than 1 and a half days per month.  R. 82.   The

hearing concluded after Dr. Lanier testified.

<u>THE DECISION OF THE ALJ</u>

The ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of his age, education and work experience.  20 C.F.R. §§ 404.1520(d),

416.920(d).  To meet this requirement at Step 3, the claimant's condition

must meet or be equal to the criteria of one of the impairments specified in

20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§

404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the

ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Gordon met his burden at Steps 1 and 2.  The ALJ found that Gordon had not engaged in substantial gainful activity since his application date of January 16, 2014, and he had the severe impairments of learning disability, affective disorder, anxiety disorder, and history of polysubstance abuse and/or addiction.  R. 20.

The ALJ found that Gordon did not have the severe impairment of mild mental retardation.  This finding differed from the ALJ's finding in Gordon's prior unsuccessful application for Social Security disability benefits.  The ALJ explained the basis for the different finding:

> The undersigned recognizes that a prior administrative law judge previously endorsed "mild mental retardation" as a severe impairment in an unfavorable decision.  However, testing over the years has yielded highly variable intelligences scores. Importantly, a 2006 vocational rehabilitation evaluation documents intelligence scores that are all within the borderline to low average range.  Many different factors may play a role in intelligence scores that underestimate an individual's mental capacity; however, an individual is not likely to perform above his intellectual capacity on intelligence testing. The broad range of scores within discrete testing sessions and the variability of scores between testing sessions is not consistent with a finding of intellectual disability. The intelligence testing in this case is consistent with a severe learning disability.

R. 22 (internal citations to the record omitted).

The ALJ found at Step 3 that Gordon did not meet a Listing.  The ALJ considered Listing 12.02 for learning disabilities and Listing 12.04 for affective or mood disorders.  The ALJ decided not to consider Listing 12.05 for mental retardation because of his finding that Gordon did not have the severe impairment of mild mental retardation.  R. 22-23.[1]  Listing 12.05C

---

[1] Effective January 17, 2017, the Social Security Administration amended the Listings for mental disorders, including Listings 12.02, 12.04, 12.05, and 12.06.  81 Fed. Reg. 66138 (September 26, 2016). The new Listings did not apply to this case because the ALJ issued the decision before the new Listings became effective.  See 81 Fed. Reg. at 66138 and n.1.

had three requirements at the time that the ALJ's decision, including a valid

IQ score of 60 through 70.  The 2006 IQ scores cited by the ALJ were

above 70, but the 2011 scores during Dr. Vincent's examination were

below 70.  The ALJ did not reference Dr. Vincent's 2011 IQ scores or his

diagnosis of mild mental retardation or Dr. Maher's 2015 diagnosis of

mental retardation in making the findings at Steps 2 and 3.  The ALJ, in

fact, did not mention Dr. Vincent at all in his decision.

> At Step 4, the ALJ found that Gordon had the following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels but with the
> following nonexertional limitations. He will have difficulty
> understanding complex and/or highly detailed instructions and
> he has deficits in concentration, persistence and pace;
> considering this, he is limited to performing non-complex,
> routine and repetitive tasks on a sustained basis with only
> routine breaks. He will do his best in a socially restricted
> setting; considering this, any work should not require more than
> occasional contact and no interaction with the general public
> and any work should not require more than superficial
> interaction with coworkers.

R. 23.  The ALJ relied on Gordon's 1999 and 2002 IQ scores that

exceeded 70.  The ALJ also relied on Dr. Trieger's 2014 evaluation in

which he found that Gordon had some cognitive limitations, but could still

handle funds without the help of a third-party payee.  R. 25. The ALJ gave

significant weight to the opinions of psychologists Drs. Mohney and

Schneider.  R. 27.  The ALJ did not consider or even mention Dr. Vincent's 2011 IQ testing that showed IQ scores below 70.

The ALJ found at Step 4 that Gordon had no prior relevant work.  At Step 5, the ALJ found that Gordon could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines and the opinions of Dr. Lanier that Gordon could perform the representative jobs of hand packager, janitor, and hospital cleaner.  R. 29. The ALJ concluded that Gordon was not disabled.  R. 30.

Gordon appealed.  On September 8, 2017, the Appeals Council denied Gordon's request for review.  The opinion of the ALJ then became the final decision of the Defendant Commissioner.  R. 1; see 20 C.F.R. §§ 404.900 and 404.955(b).  Gordon then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ here failed to articulate minimally his analysis of all relevant evidence. The ALJ nowhere mentioned Dr. Vincent's 2011 and 2012 psychological evaluations of Gordon, and in particular, did not mention Dr. Vincent's assessment of mild mental retardation and the IQ scores that were below 70. This was clear error. The ALJ relied on 1999, 2002, and 2006 IQ scores over 70 as a basis to find that Gordon did not have a severe impairment of mild mental retardation and to support his RFC

finding.  Dr. Vincent's IQ testing in 2011 resulted in scores below 70, and Dr. Vincent found mild mental retardation.  This evidence directly contradicted the ALJ's conclusions.  The ALJ did not address this conflict. He did not address Dr. Vincent's finding at all.  In fact, he did not mention Dr. Vincent at all.  The ALJ had the obligation to discuss all the material evidence.  He could not just ignore the contrary opinions of a state consultative examiner. This was clear error and mandates reversal.

The Commissioner argues that Dr. Vincent's examination was too old and not relevant.  The Court disagrees.  The ALJ relied on IQ scores from 1999, 2002, and 2006.  Dr. Vincent's IQ finding in 2011 was more recent than and at least as relevant as the earlier scores.  The ALJ erred by failing to articulate his analysis of Dr. Vincent's score.

The Commissioner argues that any error was harmless.  The Court disagrees.  The Court cannot evaluate the ALJ's determinations at Steps 2-5.  The ALJ relied on 2006 IQ testing at Step 2 to find no severe impairment of mild mental retardation.  The Court cannot tell whether that finding is correct because the ALJ failed to articulate minimally his analysis of the material relevant evidence of Dr. Vincent's 2011 IQ scores, Dr. Vincent's diagnosis of mild mental retardation, and Dr. Maher's diagnosis of

mild mental retardation.  The Court also cannot tell whether the ALJ erred

at Step 3 by considering Listing 12.05 for mild mental retardation was error.

The ALJ relied on 1999 and 2002 IQ testing to formulate his RFC, but

failed to articulate his analysis of the 2011 IQ scores and Drs. Vincent and

Maher's diagnoses.  The Court similarly cannot tell whether the ALJ's RFC

finding was accurate because he again relied on 1999 and 2002 IQ scores,

but did not articulate his analysis of relevant material 2011 IQ scores.

Because the Court cannot evaluate the RFC determination, the Court

cannot evaluate the determination at Step 5 that Gordon could perform a

significant number of jobs that exist in the national economy.  The Court

must be able to track the ALJ's analysis to make sure he considered all the

important evidence.  See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The Court cannot track the ALJ's analysis in light of these errors.  The

Commissioner's remaining arguments to the contrary are not persuasive.

The ALJ's decision should be reversed and remanded for further

proceedings.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Angelo

Gordon's Motion for Summary Judgment (d/e 10) should be ALLOWED,

the Defendant Commissioner's Motion for Summary Affirmance (d/e 14)

should be DENIED, and the decision of the Commissioner should be REVERSED and REMANDED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   November 1, 2018

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE